Good morning. The first case this morning is 09-8004 Woodward v. Department of Justice. Ms. Emory, you and Mr. Smith have divided your time. Yes, Mr. Smith will be doing the rebuttal. He'll do the rebuttal, okay. May it please the court, the BJA's denial of PSUB benefits to the petitioner should be reversed and the benefit rewarded. Because the BJA's denial was not supported by substantial evidence. It applied the incorrect regulations, including a too onerous standard of proof, and it resulted from an arbitrary and capricious process. First, the BJA is finding that there was... Can I ask you a preliminary, maybe not a preliminary question? Why is it that the fact that you declined the invitation to have it sent back for further development of the record and introduction of more information? We felt there was... Why is that not, in effect, a waiver of your position? Well, it wasn't a waiver because we still had rights that belonged to us at the hearing, at the BJA director level. The regulations don't provide for a remand-type procedure back to a hearing officer, to our knowledge. That's never been done by the BJA director. They weren't even able to articulate to us exactly what this process was. And the regulations specifically provided that during an appeal to the BJA director that the petitioner should, in fact, submit new evidence. And so the regulations actually imagine that if you're appealing your case, you have some new evidence to show the director, and the director is given all of the authority to hear that just as the hearing officer. At that time, we'd already had the claim before the agency for several years, and a remand to the hearing officer meant several more years, because if we were denied the claim, we'd once again be back in a position of appealing to the director. And given that the regulations fully took care of all our needs, gave all the authority to the director, and furthermore, the hearing officer decision we were appealing from relied only on the findings of a falsified autopsy report that had been determined conclusively to be false at that time, we couldn't imagine any reason that the BJA would need to collect more evidence. But we noted in our opposition that we were fully open to cooperate with the BJA on anything it needed more evidence on. And in fact, the BJA exercised that authority. It sought more information from the MEO's office and from the firefighters. They sent some letters, and from us as well, twice. And they used that fact-finding authority in an arbitrary and capricious way, because they didn't keep us notified that they were sending letters to the firefighter, to the firehouse, and trying to get information from the firefighters. They construed that against our firefighters, because they said that evidence, if it were received, it actually could have cleared up some of the perceived inconsistencies that were not certain in the case we presented. And they never notified that of us. We didn't learn of those letters until we actually received the final agency determination. You also waived a hearing before the hearing examiner, right? That's correct. And it's noted in the record that the reason that was waived is the hearing officer, Inez Haller herself, actually indicated to us when we informed her we intended to argue that the autopsy was falsified. It hadn't been proven by the state of Florida at that time. She said, well, if that's what you're going to argue, I'd much rather receive on the papers anything that I could hear at oral argument. And we took that to mean, first of all, that she would inform us if she thought that there was any reason to hear the witnesses or that for some reason the affidavits were not informative. And secondly, we did that in full reliance on a beyond a reasonable doubt standard, that if we could raise any reasonable doubt that the autopsy report, which was the only medical evidence available, the only one who looked at the body and took any blood samples was the medical examiner, that if we could plant any reasonable doubt as to the validity of those results, given that it's undisputed that Mr. Woodward stood in front of a fire and put it out for at least 15 minutes, if not more, and that the bathroom was full of toxins and chemicals, none of that is disputed, that there would absolutely be a reasonable doubt. And so in reliance on that reasonable doubt standard, we agreed to go along with it. Let me ask you just a preliminary factual question. When he was fighting this fire in his bathroom, was he inside the house or outside the house? He stood, according to the testimony of Chief Finkel, two to three feet from the window on the outside of the house. So he was outside helping getting the water through the window onto the fire. Yes, there was one window to the bathroom, and he was the firefighter who held the hose to put out that fire. Outside the house. That's correct, and Mr. Marcotte helped him. And he was observed by Chief Finkel and Firefighter Marcotte, who have stood in the smoke, which would have naturally been pouring out of the one window that came out of that bathroom. And that, again, is not disputed in the record. But the BJA director didn't give any weight to that fact. It wasn't discussed at all except in the facts section, that he stood outside and put out this fire. And so there is either some assumption by the BJA director that the fire was not releasing smoke or an assumption that somehow the smoke went around Mr. Woodward or that he somehow didn't inhale the smoke even though he was standing in it. But none of that was articulated. That fact that he put out a fire for 15 minutes is undisputed in the record, that he was the firefighter who held the hose is undisputed, and that would have put him in close proximity to the fire, which absolutely establishes that there was a traumatic injury, we believe, without any evidence to rebut that fact. And the BJA director not only didn't give it weight but really didn't even mention that fact. The BJA director also ignored some other very key evidence in this case. And by ignored, I mean did not mention at all. And that includes, for instance, that the bathroom was full of toxins and only a few breaths of some of the chemicals released by those could have been enough to poison him. Well, at that particular time there was reliance on the autopsy report, though. Not at the BJA director level. The BJA director received from us evidence, testimony from Mrs. Woodward, that the bathroom was full of toxins and received evidence from our experts who considered that evidence and said that smoke inhalation would have been a cause of death. But the inhalation, he was standing outside of the house, not inside the bathroom. Yes, but the bathroom was shown more evidence that was completely ignored, including photos of the extent of the fire damage true inside the house. The house sustained $35,000 worth of damage, and there are photographs in the record showing extensive fire damage. So the smoke has to go somewhere, and some of it went into the rest of the house, but you have an open window that they either broke or it was open to get the hose and the water going through the window, that smoke would have naturally been pouring out of that window, particularly given that he was standing in such close proximity to it. And there is further record evidence from Mr. Marcotte that he stood right alongside Mr. Woodward, and he said he inhaled smoke, and not only did he inhale it, but he suffered physical ailments from it the next day. He was coughing up green and yellow phlegm and had difficulty breathing for a full day afterwards. You're asking us to remand it for an application of the regulation as it existed at that particular time, the burden of proof. Would that really mean that you would be in another determination of the evidence, another weighing of the evidence by the BJA director? Well, this court can make a decision on a summary judgment type of standard that the benefit should be awarded, and we could, if the court sees fit, avoid that by having this court award the benefit. That was done by the Federal Claims Court in Bice, and it was affirmed by this court. So this court has the authority, if it finds fit, to grant us the benefit, and we think that we have clearly shown that not only is there not substantial evidence and not only was the wrong standard applied by the DOJ, but that every shred of evidence in the record is actually on our side. This isn't a case where the agency weighed conflicting pieces of evidence and then made credibility determinations at all. This is a case where the BJA, in fact, made its own inferences and citing the NIOSH report for things the NIOSH report doesn't say, came up with its own theory that isn't substantiated by any set of facts as to what happened, and on that basis, given all of the evidence we've put forth, we think that this court can grant us the benefit. But you're asking us to weigh the evidence, though. We're asking you to weigh the evidence as a matter of law under a summary judgment standard because there really isn't any conflicting evidence in this record. The BJA was very clear that it wasn't so much a conflict in many cases between NIOSH and checking the NIOSH report, NIOSH doesn't say anything that they use as a conflict, but more inherent, invented inherent problems in each piece of evidence that we put forth. We put forth so much evidence, and aside from the evidence where they found conflicts, they really didn't consider a lot of evidence. They had to. They didn't consider our, for instance, Florida Forensic Investigator's report that we submit to them, and that is entitled to substantial weight. Well, you agree, don't you, though, that there is a conflict in the evidence? No, we don't find that the record itself supports that. Are you telling us that there's no evidence to support the director's decision? None at all in the record? No. The director's decision is that there was no smoke inhalation. And even assuming, and I can get to this, but even assuming that there was heart disease and a heart attack under BICE, it's really a question of whether smoke inhalation was a substantial factor in the death, and the director recognized that. So it was on us, according to the director, to show smoke inhalation. And the way this is supposed to work under the old regulations is that we put forth a prima facie case of smoke inhalation, and then the burden of persuasion is no longer on us, that we only have to show a reasonable doubt as to whether there was smoke inhalation. And by finding there wasn't smoke inhalation, what the director essentially found is that there was an absence of proof of smoke inhalation, and there is no substantial evidence because every piece of evidence we put forth that shows smoke inhalation is not controverted by anything else in the record. To the extent that the director went and made findings that there was heart disease and a heart attack, there's also nothing credible in the record. And this is one where the court would possibly be said to weigh evidence, but they relied only on the NIOSH report, and they only relied on the NIOSH report for these so-called risk factors. Risk factors are not causal, they're just correlational, and the BJA director improperly applied his own medical experience, knowledge, to the extent that he had it, to make findings not only that Firefighter Woodward had heart disease, but that he died of a heart attack. And the only place that that's ever come up in the record, the very first time that Mr. Woodward was ever found to have heart disease, was in the Brooklyn falsified autopsy report. Why don't we let you hear from the government now? Sure. We'll give you a full rebuttal time back. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. The decision of the Bureau of Justice Assistance should be affirmed because it is supported by substantial evidence and in accordance with law. There's no real dispute that the cause of death... applied instead of the old regulation. The case was filed back in 2003 when the old regulation was still in effect. The BJA's policy has been to apply whatever regulations are in effect to any pending claims, no matter what stage of the claim it was in. So here there was an appeal to the director in 2006. The regulations were revised in September of 2006, and then the Petitioner's Council filed their brief almost two months after that. So they were on notice of the new regulations that had been promulgated at that time. They certainly would have been on notice given the notice of proposed regulations. But in 2008, BJA restated its longstanding policy to apply regulations that were in place at the time of the decision. And this Court, I believe in Groff, has noted that the BJA has certainly permitted to do that. And this Court's never addressed it specifically, and it didn't address it specifically in the Juneau decision. But there's certainly no reason why those regulations couldn't have been applied to the claim as it was pending before the director. But at that particular point in time, their burden of proof was different when they submitted their evidence. Your Honor, the only thing that changed with respect to the burden of proof, I want to be very clear that the petitioners have always had the burden of proving their claim by a preponderance of the evidence. And that burden has always rested with the petitioners. What changed in 2006 was that the reasonable doubt standard, which applied only to the factual questions of the injury or the death, that where there used to be an equipoise of evidence, the thumb would be placed on the scale to benefit the petitioners. So say a 50-50, it would be changed to a 51-49, a preponderance of the evidence. And even if that regulation shouldn't have been applied, we contend that that is harmless error because the BJA director did not find that there was evidence in equipoise. In fact, what he said was that the claimants had not convinced him that smoke inhalation or carbon monoxide exposure was any factor in the death. And so even under a reasonable doubt standard, the result would not be different. So even assuming that the 2006 regulations were improperly applied, it's harmless error. There's no reason to repeat it. No, we're not talking about improperly applied as to whether the burden of proof was properly met under the old regulation versus the burden of proof under the new regulation. Well, the burden of proof, again, is placed on the petitioners. And this Court has said as much in Greeley, in fact, quite emphatically in Greeley, that the claimants have the burden to prove their case by a preponderance of the evidence. And the only difference was this reasonable doubt that would be applied to questions of facts surrounding the event. And so in terms of did they have the burden to prove their claim, absolutely, they've always had that burden. Well, they've always had that burden, but at this particular juncture, you also have an autopsy report which was relied upon by the agency at one point to be proven false. Well, we don't know that the autopsy was proven false. We know that the COHB testing wasn't performed, and I don't think there's any dispute about that. But what we have in 2006 was the state medical examiner going back and reviewing and relooking at that autopsy report and basically coming to the same conclusion that the cause of death was heart disease and simply changing from a natural to an accident with the amendment that stress associated with a house fire and probable smoke exposure were contributory factors. The only basis for the medical examiner's notation that there was smoke exposure were the very same 2005 affidavits provided by the claimants, which the BJA director found to be not or entitled to little weight. So we think that the result is the same. I mean, the cause of death remained the same, and the only evidence of smoke exposure remains the same factual affidavits in 2005 that are remarkably different from the factual accounts that were recorded close to the time of the event. The medical director's reconsideration of it has to be from reports and records. It couldn't be based on an autopsy because it was too late, right? Why should these people suffer the consequence of the dereliction of the government officials in their official duties? He's supposing that this is what it was, but they would have known for sure had the original coroner done what he was supposed to do. Right, and we agree, and the BJA agreed, that given the problems with the autopsy, that other evidence, circumstantial evidence, non-medical evidence, things like that, could and should be considered to demonstrate that smoke inhalation was a substantial factor in the injury. And what the BJA director said was, in considering this evidence, what you have provided to us does not demonstrate that there was any significant exposure to smoke in a quantity and a volume and a manner that would suggest that there had been any smoke exposure. What we have here is a small fire that was put out for 30 minutes. The firefighter goes and attends to personal business with no distress. There's no record of him complaining of any symptoms. No other firefighters had any symptoms. Suppose there had been a proper autopsy. Would that have answered dispositively this question? It could have, Your Honor. Certainly if the COHB levels were above a certain percentage. If the numbers were such that it was clear that there was substantial smoke inhalation, that would be dispositive of it. But we don't know what it would have shown, because there wasn't a proper autopsy, apparently. Right. Had the numbers been above a certain percentage, and in fact it would be above 10% for non-smokers, or in the case of Mr. Woodward, 15% COHB for a smoker, because smokers can actually tolerate more smoke than non-smokers, then that would have been proof that the BJA would have accepted and has accepted. But it's also the case, and we know this from the decision in BICE, that BJA must look at other evidence besides simply the COHB levels to determine whether there's any other reason to suggest that the petitioners or claimants have demonstrated that. And the BJA director did so in this case and concluded that given the facts as the BJA director found, looking at the conflicting evidence, and I think it's hard to say that there's not conflicting evidence and there wasn't a fact finding that had to be made by the BJA director here, the BJA director found that the fire was put out quickly, that there was no symptoms, no complaint of symptoms, no complaints of distress, no other firefighters had any respiratory problems that they reported that night. There's ample, and given the risk factors, and the 2006 autopsy report which says that the cause of death is heart disease. I think all of those things are ample substantial evidence to infer. You say they didn't report any symptoms that night, but they did later. Right, but I'm sorry, to be clear, what I'm saying is for 30 minutes after the fire was put out, there was no complaints of coughing, no complaints, no one reported when the NIOSH director came back a few months later and interviewed all the firefighters that were present that night. None of them reported that he complained of any symptoms or complained of any smoke until he had the chest pain and reported to the ambulance 30 minutes later. Vice is a decision by the court of claims, so it's not binding on us. No, you're right. You're correct. However, taking some of the logic of that, would that really support the equiposed position of the BJ at this point, the analysis that was done in Vice for smoke inhalation? Well, I think we have different facts that support the decision in Vice. In Vice, the firefighter was fighting in a forest for two and a half hours, was not using a respiratory respirator, complained immediately. But the issue there was whether or not the fact that the state agency had found and made a determination that it was causal related to the firefighting activities was more of the aspect of what the decision was based upon. We have a different situation here, don't we? My recollection of Vice was that the problem was that there had been no autopsy performed, and so there were no, just as here, there were no objective tests to say one way or the other whether carbon monoxide poisoning had been a factor. But I think the same principle is here, is that the BJ is free to consider other evidence, such as descriptions of what happened that night, to paint a picture of what happened and whether it's more likely or not that smoke inhalation was a substantial factor in the heart attack. And here, the BJ found that the petitioner simply hadn't met that burden. But if, in fact, the aspects of the conflicting evidence is taken into account, how would the result be different, if at all, under the old regulation? Well, again, I think we have to say that it wouldn't be any different because what, first of all, simply even if a reasonable doubt standard applied, the BJ director is absolutely free to weigh facts and to make factual findings. I think given the discrepancies in the factual accounts, it's not as if the facts could go one way or the other. I think we have markedly different accounts of what happened that night, and the BJ director was required to consider that and make credibility determinations. And I don't think that even applying a reasonable doubt standard, that discretion to make those credibility determinations goes away. I think it remains the same. You're not arguing that credibility determinations based on documents are binding as to whether or not it's an actual witness type of credibility determination during an oral hearing. Is that a different credibility determination from a document versus oral presentation of evidence? Well, certainly this Court has given a higher level of deference where there is a fact finder who observes the witnesses. But even, and I believe we cite the Henry v. Department of Navy case in our brief for this proposition, which is an MSPB case, even where there is no oral hearing or opportunity to consider oral testimony, those credibility determinations are entitled to substantial evidence, and there must be some reason, I'm thinking of the languages, to some objective impossibility or something like that for this Court to reverse those credibility findings. But I think absolutely the fact finder is entitled to make credibility determinations, and they're entitled to deference on review. You cited the Amber Messick case. That case from this Court applied the older regulations and not the ones that were currently in place. Does that matter to your case here? I apologize, Your Honor, because I'm not remembering what the particular regulations were in that case. I don't know that that, what I can say is that I know in case after case after case, BJA has applied the present regulations, the current regulations to any pending claims, and I know that in this Court, in Groff, this Court recognized that to the extent that the BJA makes regulations that are entitled to Chevron deference, they're entitled to Chevron deference. I'm not sure that Amber Messick specifically addressed when regulations should be applied to pending claims, but I'd be happy to present that in a further pleading if the Court would find that helpful. Well, what I find troublesome is the fact that the aspect of the burden of proof has changed in midstream, and they would not have had an opportunity to establish the claim under the new burden of proof versus the prior burden of proof. So you're changing the rules at that particular level, and is that a proper way to approach it? Well, I think, and this Court goes back, first I think the shortest answer is that in this case it's harmless errors. This Court doesn't even need to address that issue. But if we look at what this Court has said in Princess Cruz's and what this Court has said in Tarver, when we're looking at whether new regulations should be applied to old conduct, we have to look at what the petitioners would have done differently had they known about the new regulations. And in this case, they suggest that they would have perhaps had a hearing. Well, they were offered a hearing, and so whatever harm may have come from applying the new regulations could have been vitiated by an opportunity to present evidence, present hearing testimony, which could have clarified the questions that the BJA had in front of an independent hearing officer. And the petitioners declined to do that. Okay. Thank you. Thank you, Your Honor. Mr. Smith. Thank you, Your Honors. Josh Smith for the petitioners. On rebuttal, just a few points. First, just picking up where the government left off, on reliance, we in our briefs argue how we relied on the old regulations. And if we were informed that a different standard was going to be applied to us, that is, if we were informed that the preponderance of the evidence standard was going to be applied to us, we certainly would have been able to provide additional material to the agency. And I think that our motion to supplement to this Court is indicative of what we would have been able to provide to the agency had they let us know that a different standard was being applied to us. The government argued about the Bice case, and I'd like to refer to the part of the BJA determination where the BJA required us to produce a quantity of smoke or a lethal amount of smoke. And I think we're all four squares there on the Court of Claims opinion in Bice, where the Court said that we were not required to show a medically quantifiable or lethal amount of smoke. And in this case, obviously that's impossible because the body was cremated after the falsified autopsy report, and there was no recourse to produce that kind of perfectly medical empirical evidence. There was a piece of contemporaneous evidence that smoke inhalation occurred, and this is the EMS run report. This report was filled out by the paramedic Matthews, and his report reflects that Mr. Woodward reported smoke inhalation and chest pain as a result of that. This is immediately or very shortly thereafter of the fire, and this is a piece of contemporaneous evidence, and the BJA director ignores this piece of evidence in making its credibility determinations and in developing its story of what happened that day. Will you afford an opportunity at that point by the BJA director to submit additional evidence and hold a hearing based upon a new regulation? No, we were never given that opportunity. As a matter of fact, we expressed our reliance on the old regulations to the BJA, and in our letter that is in the record in 2008, where we stated we believe we've raised a reasonable doubt, we signed the reasonable doubt regulation to the state deferment regulation, which is also an older regulation, and so we expressed our reliance on the old regulations to the BJA, and they never corrected us or came back to us to say, hold on, the standard is higher now. And certainly because an agency has a policy that it can make regulations and apply them retroactively, that doesn't mean that that policy trumps the case law. One last point about credibility determinations. The government argues that it is almost near impossible to review them. However, this court has reviewed credibility determinations. In the JC Equipment case, and... Is there a difference in credibility determinations between oral testimony versus written testimony? Should there be a different standard of review at that point? Yes, I appreciate the distinction between oral testimony, written testimony.  And on written testimony, you have the words. That's all you have to go by. How about the right to cross-examine? I'm sorry? How about the right to cross-examine a witness, which we really don't have when it's a written deposition at that particular point, if it's done unilaterally through an affidavit or otherwise? Yes, that's another reason for having a higher standard of deference applied to written testimony, absolutely. If the court does look into the credibility determinations that the BJA director made, and the rationale that the BJA director gave, not the government in its briefs, but the BJA director gave for his credibility determinations, I think the court will find that there are not actual contradictions in what was testified. For example, Chief Finkel said that he reported minor chest pain. Chief Finkel said he described a burning sensation in his chest. I don't see a contradiction there. That's not a round square, that those two statements written do not contradict. And those are the kind of credibility determinations that, or that's the logic that the BJA director used, or illogic he used, to discredit our evidence. And we believe that if you do review it, you'll find some clear error there. But I'm out of time, and if you don't have any further questions, proceed. All right. Thank you very much. Thank you. The case is submitted.